UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

LARRY FREEMAN,

                Plaintiff,

        v.                                 Case No.   09-C-0947

MICHAEL J. ASTRUE,

                Defendant.

## DECISION AND ORDER REMANDING CASE FOR AWARD OF BENEFITS

The Social Security claim at issue in this case was filed sixteen years ago and involves an alleged disability occurring no later than December 31, 1973, almost forty years ago. This is the third time plaintiff Larry Freeman's claim for Disability Insurance Benefits (DIB) has been appealed to a district judge in the Eastern District of Wisconsin. Freeman, who is now seventy years old, claims that he is suffering from post-traumatic stress disorder following his Vietnam-conflict military service, which ended in 1966. Even though Freeman applied for DIB in May 1995, when he was fifty-four, his claim now covers a closed period of time, as Freeman began receiving Social Security retirement payments at age sixty-five.

The Commissioner filed a motion to remand this case under sentence four of 42 U.S.C. § 405(g), admitting that the administrative law judge, for the third time, committed errors regarding Freeman's claim. Freeman opposed a remand and sought an outright award of benefits under *Worzalla v. Barnhart*, 311 F. Supp. 2d 782 (E.D. Wis. 2004). In an order dated March 28, 2011, this court denied remand motion and stated that the case would be reviewed for an award of benefits under either of two theories

mentioned in *Worzalla*: (1) if the record overwhelming supports a finding of disability, or (2) if "the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court," *Worzalla*, 311 F. Supp. 2d at 800. The court discussed *Worzalla*, *Rohan v. Barnhart*, 306 F. Supp. 2d 756 (N.D. Ill. 2004), and *Wilder v. Apfel*, 153 F.3d 799 (7th Cir. 1998), in support of the second theory, also known as the "obduracy exception." All three cases involved drawn-out proceedings at the Social Security Administration and/or the agency's refusal on remand to follow court directions.

This court gave the Commissioner an opportunity to file another brief on the merits and on the obduracy exception. Consequently, the Commissioner argued that subsequent to *Worzalla* the Seventh Circuit determined that the obduracy exception alone is not a permissible basis for awarding benefits outright. As support, the Commissioner cited *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005).

It is unfortunate that the Commissioner failed to discuss *Briscoe* in his reply brief on the motion to remand regarding the obduracy exception of *Worzalla* as he would have saved the court and claimant Freeman (whose claim is already sixteen years old) time, as *Briscoe* prohibits this court from awarding benefits outright as a result of the Commissioner's obduracy. 425 F.3d at 357 ("Obduracy is not a ground on which to award benefits; the evidence properly in the record must demonstrate disability.").

Notably, the court notes the Commissioner has failed to dispute, factually, that the agency has been obdurate. In the March 28 order this court asked the Commissioner to explain why he deserves a fourth opportunity to determine Freeman's claim correctly and why the ALJ failed in the third decision to follow the instructions of

2

District Judge J.P. Stadtmueller following the second appeal. The Commissioner does not provide any explanations for the delays in this case—for instance why it took the Appeals Council three years to issue a decision following the first ALJ decision in Freeman's case and another three years to issue a decision following the second ALJ decision. Nor does he explain why Judge Stadtmueller's directions were not followed.

Nevertheless, this court is bound by *Briscoe* and cannot award Freeman DIB based on obduracy, even if factually justified. As stated in *Briscoe*, the court may award DIB only on grounds provided in 42 U.S.C. § 423, which require that the claimant be disabled. 425 F.3d at 357. Thus, "an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Id.* at 356.

To be entitled to DIB, the claimant has to establish that his disability arose while he was insured for benefits. *Id.* at 348; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1). Freeman applied for DIB on May 22, 1995. However, it is undisputed that his insured status for DIB eligibility expired on December 31, 1973. Thus, to be entitled to DIB he has to establish that he was disabled on or before that December 31, 1973.[1]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and is based on the proper legal criteria. *Briscoe*, 425 F.3d at 351; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, when supported by substantial evidence, are conclusive. § 405(g). Substantial evidence is relevant evidence that a reasonable person could accept

---

[1]Freeman amended the alleged onset date to January 1, 1973, to avoid issues relating to some of his post-Vietnam employment. (*See* Tr. 508.)

3

as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). This court cannot reweigh evidence or substitute its judgment for that of the ALJ. *Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, if the ALJ commits an error of law reversal is required without regard to the volume of evidence supporting the factual findings. *Id.*

Failure to follow the Commissioner's regulations and rulings constitutes legal error. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991). The agency's failure to follow a federal court's order on remand also constitutes legal error, subject to reversal in a subsequent appeal. *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989); *see Wilder*, 153 F.3d at 803.

An ALJ must "'minimally articulate his reasons for crediting or rejecting evidence of disability,'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he or she cannot discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review," the district court should remand the case. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal quotation marks omitted). However, a "sketchy opinion" may be sufficient if it is clear the ALJ considered the important evidence and the ALJ's reasoning can be traced. *Id.* at 787.

To obtain DIB a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505; *Briscoe*, 425 F.3d at 351.

The Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; *Briscoe*, 425 F.3d at 351. The ALJ must determine at step one whether the claimant is currently engaged in substantial gainful activity. If so, he is not disabled. If not, at step two the ALJ must determine whether the claimant has a severe physical or mental impairment. If not, the claimant is not disabled. If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity. If so, the claimant is found disabled. If not, at step four the ALJ determines the claimant's residual functional capacity (RFC) and whether the claimant can perform his past relevant work. If he can perform his past relevant work he is not disabled. However, if he cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to make the adjustment to other work. If the claimant can make the adjustment, he is found not disabled. If he cannot make the adjustment, he is found disabled. 20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young*, 362 F.3d at 1000-01. The

Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. § 404.1545(a)(2), (e).

The burden of moving forward at the first four steps is on the claimant. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *See Briscoe*, 425 F.3d at 352; *Young*, 362 F.3d at 1000. Where a claimant is found disabled but the question is whether the disability arose at an earlier date, the ALJ must apply the analytical framework of SSR 83-20 to determine the onset date of disability. *Briscoe*, 425 F.3d at 352.

## CASE HISTORY

Freeman applied for DIB on May 22, 1995. (Tr. 81-83.) The claim was denied initially (Tr. 84) and after Freeman's request for reconsideration (Tr. 90.) Freeman then requested a hearing by an administrative law judge (ALJ). (Tr. 94.)

ALJ Patrick D. Halligan issued the first decision denying Freeman's DIB claim on October 27, 1997, following a hearing held September 4, 1997. (Tr. 17-33.) ALJ Halligan found that Freeman passed through step four of the sequential analysis (although some steps were just barely met) but that at step five he was not disabled because of the "wide range of occupational opportunities" available. (Tr. 30-32.) However, the Appeals Council reviewed the appeal de novo and issued its own decision on January 6, 2000, replacing the ALJ's decision. (Tr. 5-8.) The Appeals Council held that as of December 31, 1973, Freeman had no severe impairment (Tr. 6-7), thus finding that Freeman had not passed step two of the sequential analysis. On June 11, 2001, District Judge Thomas J. Curran remanded the case to the agency, citing errors regarding the agency's

6

assessments of medical evidence, whether Freeman's employment in 1978 was an unsuccessful work attempt, and Freeman's credibility. (Tr. 394-96, 374-92.)

On remand ALJ Halligan held another hearing. He issued his second denial on May 20, 2002, finding that Freeman was not disabled at step four of the sequential analysis because he could return to his past employment as an automobile assembly line worker. (Tr. 343-59.) The Appeals Council denied review on July 12, 2005, making the ALJ's decision the final decision of the Commissioner. (Tr. 328-31.) On July 27, 2006, District Judge J.P. Stadtmueller remanded the case to the agency, finding that the ALJ failed to establish the demands of Freeman's past relevant work, failed to explain how he determined RFC, and improperly barred Freeman from testifying about the onset of his symptoms that arose prior to 1973. However, Judge Stadtmueller determined that ALJ Halligan's decision was adequate regarding Freeman's credibility and consideration of treating-physician evidence. (Tr. 625-47.[2])

Upon remand the Appeals Council reassigned the claim to ALJ Margaret O'Grady. She, too, held a hearing (Tr. 658-84) and denied Freeman's claim, issuing her decision on January 25, 2008 (Tr. 615-23). Although ALJ O'Grady did "not necessarily accept the ultimate findings or decision" of ALJ Halligan in his two prior rulings, she was "satisfied with [ALJ] Halligan's discussion and analysis of the evidence and hereby incorporates it by reference. She will not repeat any of those records except to the extent that further clarification may be necessary." (Tr. 620.)

---

[2]The court takes judicial notice of page two of Judge Stadtmueller's decision of July 27, 2006, which was missing from the administrative transcript but is available through the court's CM/ECF system.

ALJ O'Grady found that Freeman retained the RFC for medium exertion work "limited to unskilled, simple low stress routine repetitive work with no public contact, occasional interaction with co-workers and occasional stooping and crouching." (Tr. 623.) Based on this RFC, she held that Freeman could perform his past relevant work as an assembler and, alternatively, could perform a significant number of jobs in the economy. (Tr. 615-23.) Thus, she determined the claim at step four or, as an alternative, step five of the sequential analysis. The Appeals Council denied review on July 30, 2009, making ALJ O'Grady's decision the final decision of the Commissioner. (Tr. 602-04.)

The third time was not the charm. The Commissioner now admits that the ALJ again erred. (Def.'s Reply at 6.) Instead of filing a response brief on the merits of the appeal, the Commissioner moved to remand the case under sentence four of 42 U.S.C. § 405(g). Understandably, the plaintiff, after so many years, opposed the motion and seeks an outright award of benefits.

Freeman served the United States in combat in Vietnam for fifteen months in 1965 and 1966. In 1995 the Veterans Administration (VA) awarded Freeman service-related disability for post-traumatic stress disorder (PTSD). (Tr. 148.) The VA found Freeman's PTSD was 100% disabling and service-connected. (Tr. 148.) Freeman did not seek treatment for PTSD until 1994, when he went to the VA for treatment on his back and the doctor who saw him referred him for PTSD treatment as well. (*See, e.g.*, Tr. 670.) It appears undisputed that as of the date of the VA award in 1995, Freeman's PTSD incapacitated him to an extent that he could not work.

The question in this case has always been whether Freeman's PTSD was so disabling that he was unable to work by his date last insured, December 31, 1973.

Freeman did not file his claim until May 1995, and looking back twenty-two years was not easy. Review is certainly no easier now that 1973 is thirty-eight years in the past.

ANALYSIS

Judge Stadtmueller remanded Freeman's case for the ALJ to (1) establish the demands of Freeman's past relevant work, (2) explain how the RFC was determined, and (3) consider testimony from Freeman about the onset of his symptoms before 1973. (Tr. 636-39, 645.) ALJ O'Grady did none of these things.

Although ALJ O'Grady obtained testimony from Freeman about his past assembly work, she failed to discuss the demands of that work other than to note that vocational expert (VE) Jacquelyn Wakeman (misidentified as Wenkman) classified it as "medium and unskilled." (Tr. 620.) ALJ O'Grady observed that the district court found there had been little to no in-depth analysis of the job as Freeman performed it or any correlation between that job and Freeman's RFC on a function-by-function basis. (Tr. 620.) Yet, she did not provide any such analysis. Instead, ALJ O'Grady simply concluded:

> [T]he undersigned finds that up to at least the end of 1973 claimant was capable of unskilled light and medium work, including his past relevant work as an assembler. Because claimant was less than precise regarding that job and in view of questions whether it constituted substantial gainful activity, not to mention the issues that the District Court had raised regarding step four (i.e. can do past relevant work), the undersigned is going to step five . . . to find claimant not disabled.

(Tr. 622.) Then, notwithstanding her statement that she was going to pass step four, ALJ O'Grady determined that "[t]hrough the date last insured, the claimant was able to perform his past relevant work as an assembler." (Tr. 623.) As an alternative, she then found that Freeman did not satisfy step five.

9

For the ALJ to rely on Freeman's failure to pass step four as one of two alternate grounds for relief, she needed to comply with Judge Stadtmueller's directions as to Freeman's past assembly work at American Motors. For instance, she should have addressed Freeman's testimony that his job required him to reach over his head and screw hoses into the transmission, yet he "cross threaded the little things. . . . just couldn't do it. . . . had to call repair so many times." (Tr. 663-64.) He would try to screw something on and would screw it on improperly. (Tr. 663.) Freeman also stretched and tightened seat covers but testified that he "just couldn't seem to focus on it." (Tr. 664.) He was moved to different jobs and ended up putting washers on screws. (Tr. 664.) Furthermore, the workplace involved loud noises that caused Freeman's PTSD symptoms to come out. (Tr. 667.) For instance, when he worked next to a "drop forge" the sudden noises would make him duck like he was being attacked. (Tr. 668.) Freeman would have to leave the workplace to sit in the restroom for ten or fifteen minutes to settle down. (Tri. 668.)

The ALJ discussed none of this in her decision. Instead, she concluded without elaboration that at the end of 1973 Freeman was capable of doing his past assembly work.

Next, ALJ O'Grady failed to follow Judge Stadtmueller's direction to explain how she determined RFC. According to the ALJ, Judge Stadtmueller's concern as to RFC was only as to consideration of testimony by Freeman regarding his condition from 1966 through 1973. (Tr. 620.) But Judge Stadtmueller added that ALJ Halligan had failed to "explain how he formulated Freeman's residual functional capacity" or "how he determined Freeman's limitations in formulating his residual functional capacity" (Tr. 638, 645.) ALJ O'Grady incorporated by reference ALJ Halligan's discussion and analysis of the evidence

10

(Tr. 620), which did not contain a proper RFC analysis. She did not then provide any additional analysis of how she determined Freeman's RFC at the end of 1973. (Tr. 615-23.) She mentioned that VE Wakeman was asked a hypothetical regarding an RFC "for simple, unskilled, low stress work of at least medium exertional level where there is occasional interaction with other workers, no public contact and only occasional stooping or crouching" (Tr. 622) but did not explain how she arrived at that hypothetical. She then concluded, with no related discussion:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work. As of that time claimant was also limited to unskilled, simple low stress routine repetitive work with no public contact, occasional interaction with co-workers and occasional stooping and crouching.

(Tr. 623.)[3]

A Social Security ALJ must explain and support the grounds for determining a claimant's limitations in formulating RFC. *See Clifford*, 227 F.3d at 870, 872 (stating that the ALJ must minimally articulate his reasons and build an "accurate and logical bridge from the evidence to his conclusion"). ALJ O'Grady, like ALJ Halligan, failed to properly discuss how she formulated Freeman's RFC.

---

[3]ALJ Halligan determined the following RFC for Freeman:

[A] medium (but not heavy) postural and exertional capacity [with] the cognitive and emotional capacity for predicable indoor work in safe, defined environments requiring mastery of no longer than three step industrial sequences and requiring compliance with basic supervision and quality control feedback but demanding no leadership, responsibility for others, persuasion, problem solving, or more than perfunctory human relations transactions and allowing absences or early departures eight times or so per year and unscheduled breaks of five minutes or so on account of intrusive memories about five times per month.

(Tr. 354.) ALJ O'Grady did not discuss why her RFC differed from ALJ Halligan's.

In addition, ALJ O'Grady insufficiently considered Freeman's testimony about the onset of his symptoms before 1973, even though Judge Stadtmueller directed her to address that matter. Freeman's testimony at the third hearing extended for eighteen pages of transcription. (Tr. 660-77.) ALJ O'Grady summarized Freeman's testimony as follows:

> At the hearing before the undersigned[,] claimant repeated his medical history and was allowed to address any issues regarding his alleged post traumatic stress disorder both prior to 1973 and after 1973. These include marital problems and employment issues, even before his military service. Claimant tended to be rather vague as to why he was unable to work. While he denied any marijuana or other drug use prior to his date last insured, a report from a VA psychiatrist indicated that claimant reported he was using marijuana during his service and on his return from the service. There were also indications of excessive alcohol abuse.

(Tr. 621.) Absent is any discussion of Freeman's specific testimony that provides evidence of PTSD in 1973 and earlier, the severity of Freeman's PTSD at that time, and the effect of the PTSD on his RFC at that time.

Notably, Freeman testified that during the very first night he returned to his mother's house after military service a train went by on nearby tracks. His mother found him under the window looking for his weapon because he thought they were under attack. (Tr. 662.) Freeman added that thinking he was under attack "was kind of a lifestyle for a while there. It was terrible." (Tr. 662.) The train, loud noises, and shaking made him think he was under attack at that time. (Tri. 662.) As indicated above, while at work, Freeman ducked after hearing loud noises and had to recover in the restroom for ten or fifteen minutes. (Tr. 668.) Freeman's testimony about his prior work indicated that he was moved from job to job at American Motors, not being able to screw hoses on properly or focus on stretching seat covers. (Tr. 663-64.) He stated he had a temper, got into fights outside the

12

workplace, and needed help with instructions on a construction job. (Tr. 664-66.) Freeman further testified that he started a fluid power course at technical school, but transferred to another course halfway through, then halfway through the second course he dropped out. (Tr. 673-74.) According to Freeman, he "couldn't handle it." (Tr. 674.)

Freeman, an athlete before his Vietnam service, became anti-social and inactive after discharge. Freeman had been a nationally-ranked cyclist, boxer, jogger and baseball player. After his Vietnam service, he tried to play softball but was no longer good at it and had interest in sports. (Tr. 670.) At family gatherings Freeman usually sat alone in a room because he did not "want to mix with the people." (Tr. 662-63, 669.)

Freeman testified that following his return from Vietnam his home "was always a mess." (Tr. 666.) His aunt cookedfor him and did his laundry. Freeman said he could not do those things for himself because "[i]t just didn't seem important enough . . . everything was a hassle." (Tr. 666-67.) Freeman testified that during the early years following his Vietnam service he drank too much alcohol. From 1966 to 1973, when things bothered him he would drink and forget about everything. (Tr. 675.) He would drink in a bar or tavern three to five times a week. (Tr. 675.) Freeman usually went alone and would drink until he was intoxicated. (Tr. 676.)

When asked by ALJ O'Grady why he was unable to work from 1966 to 1973 and what his limitations were, Freeman responded: "I don't know myself. It's just that things just drove me nuts. My patience was at a stand still." (Tr. 677.) However, at the first administrative hearing Freeman stated that in 1973 he was "upset at everything" and had a terrible temper. (Tr. 50.) He said that while he worked at American Motors he was drinking a lot and "was nuts then." (Tr. 55.)

13

ALJ O'Grady discussed none of this testimony except to note that Freeman was "rather vague as to why he was unable to work" and indicated excessive alcohol use. (Tr. 621.)  She did not discuss whether any of Freeman's testimony correlated with recognized symptoms of PTSD discussed in other portions of the record or whether Freeman symptoms showed severe PTSD in 1973 that prevented substantial gainful activity (or the lack of such severity).  At the first administrative hearing, one of Freeman's PTSD doctors, Dr. Michael Pritchard, testified that Freeman's history and symptoms were very common regarding combat veterans:

> The history and the symptoms are fairly typical of post traumatic stress disorder—usually begins in country; although, often there's, you know, some delay upon a person's return. The symptoms—especially the self-reported symptoms—tend to be of the nightmares and flashbacks; the generalized agitation—especially the anger—and it is often accompanied by substance abuse, break-up in relationships, the inability to work—especially the continuing loss of jobs until, finally, unemployment results.  The whole pattern is—you know, it's very typical.

(Tr. 72-73.)  Dr. Pritchard said he believed Freeman's PTSD symptoms began "in country" and had worsened over the years.  (Tr. 72.)  He opined that Freeman

> has experienced some fairly debilitating symptoms for—essentially, since his discharge; one of them is social isolation.  He also has a lot of intrusions on his thoughts, so he's not able to make—and he wasn't able to maintain his concentration.  His emotional control was very poor; he had a tendency to become very angry and involve himself in altercations with other people.  Again, he, he chose alcohol as a symptomatic relief and he also had very poor sleep, and his self-care and all the other things that, that—the symptoms that correlate with post traumatic stress disorder.  All of those things, I think, went into making him unemployable not just the, the isolation.

14

(Tr. 73-74.) Dr. Pritchard's opinion was that this had been Freeman's condition since his discharge date. (Tr. 74.) Freeman's testimony about his condition and employment in or before 1973 matched the doctor's description of debilitating PTSD symptoms. Yet ALJ O'Grady did not discuss the correlation.

ALJ O'Grady made no sufficient determination that Freeman's testimony at the third administrative hearing was not credible, yet she ignored that testimony as well. She commented that Freeman was vague about why he was unable to work, without addressing whether any evidence in the record suggested that a lay PTSD sufferer would be able to explain his anger, loss of interest, lack of focus, or why he bounced from job to job to school to job. Moreover, Freeman was not necessarily vague; he stated that things "drove [him] nuts" and that he had no patience at that time. ALJ O'Grady downgraded as unpersuasive Freeman's testimony and the "post hoc letters" of Freeman's ex-wife and mother, which corroborated other evidence showing the existence of his symptoms when he returned from Vietnam service, "given the absence of any complaints of any kind even related to a possible mental disorder," without discussing the time frame for recognition of Vietnam-related PTSD.

Like the Appeals Council, whose decision back in January 2000 was reversed by Judge Curran, ALJ O'Grady focused greatly on evidence that Freeman was not treated for his PTSD until 1995, without acknowledging that in or before 1973 PTSD was not recognized or treated. Freeman first heard of PTSD only in 1994 when he went to the VA for an x-ray on his back and the doctor referred him to a PTSD doctor. (Tr. 62.) Although Dr. Pritchard did not work at the VA in 1980 he had heard that through that date "there wasn't really any treatment available; in fact, that the diagnosis really wasn't made at that

15

time." (Tr. 70.) Responding to ALJ Halligan's first decision, suggesting that Freeman's failure to seek treatment diminished his credibility, Dr. Pritchard reported that "[h]istorically the identification of Post Traumatic Stress Disorder and the subsequent provision of treatment was extremely slow in coming to these veterans. Indeed in 1973, the diagnosis of PTSD was not in common use, there was no provision for routine examination of these symptoms in Vietnam era veterans, and there was little or no available treatment for them." (Tr. 257.) According to a discussion of PTSD Veteran's Administration's physician's guide, PTSD diagnosis of Vietnam veterans "was prevented . . . by the fact that DSM II, in effect from 1968 to 1980, provided no diagnostic category for a war stress reaction. This was corrected in 1980 by DSM III, which established the diagnosis of PTSD . . . and set forth clear diagnostic criteria." (Tr. 232, 294.) Hence, there was no support for ALJ O'Grady's inference that lack of complaints, treatment, or an award of VA benefits before 1995 meant Freeman's PTSD was not disabling. Moreover, contemporaneous medical evidence is not required for Social Security benefits; "[w]hat is required is contemporaneous corroboration of the mental illness." *Wilder*, 153 F.3d at 802.

Finally, as Freeman points out in his brief, ALJ O'Grady misconstrued the meaning of documents and proceedings at the VA when discussing Freeman's condition in 1973 and improperly used the date of the VA award to give treating physician opinions lower weight. The VA "Rating Decision Sheet" awarded a 100% disability from February 7, 1995, which was the date of Freeman's claim. (Tr. 148-49.) Said ALJ O'Grady:

> The fact that it was not until 1995 that claimant was even awarded disability for post-traumatic stress disorder by the Veterans Administration and given the absence of any complaints of any kind even related to a possible mental disorder, other than post hoc letters from claimant's ex-wife

16

and his mother, and of course claimant's own testimony, one could certainly see why the mental health professionals for the Wisconsin Disability Determination Services concluded there was no severe mental impairment. Obviously neither Dr. Chicks nor Dr. Prichard [sic] could convince the Veterans Administration to award disability for posttraumatic stress disorder any earlier than 1995. To expect to rely upon either of those individuals to lend support to a finding of disability in 1973 for Social Security Administration purposes seems questionable to say the least.

(Tr. 621 (citations omitted).) However, the evidence in the record shows that the existence of PTSD before 1995 was not an issue considered by the VA. The VA benefits did not predate Freeman's application for benefits in 1995—thus there was no failure to "convince" the VA to award pre-1995 benefits. (*See* Tr. 148 ("[T]he law . . . says payments must begin the first day of the month after you become entitled to the benefit."), 256 ("It is not necessary in the Veterans Administration for the exact onset or the various stages of the disability to be established but rather that the disability exists at the present moment.").) No attempts at such convincing were made because they were irrelevant. Thus, the evidence from Dr. Chicks and Dr. Pritchard cannot be downgraded based on a nonexistent failure to convince the VA of an earlier onset date, nor can any negative inference be drawn from the first date that Freeman received VA benefits.

Clearly, as even the Commissioner admits (Mot. to Enter J. Rev'g Comm'r's Decision with Remand to Agency), ALJ O'Grady's decision must be reversed and Freeman's case remanded.

REMEDY

The remaining question is whether the court should direct an award of benefits or remand for a *fourth* administrative hearing and decision by the ALJ. A direct

17

award of benefits by the district court "is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe*, 425 F.3d at 356.

This court believes that an award of benefits is appropriate. In his motion to remand, the Commissioner promised that "upon remand, the ALJ will obtain medical expert testimony to further evaluate the nature and severity of Plaintiff's mental and physical impairments as of his date last insured. Further, as appropriate, the ALJ will proceed through the sequential evaluation process, which will include considering Plaintiff's testimony and evaluating his RFC." ((Mot. to Enter J. Rev'g Comm'r's Decision with Remand to Agency at 6.) In denying the motion to remand, this court was unpersuaded that another opinion, from someone who has never examined Freeman, about Freeman's condition almost forty years ago, would add much to the evidence in the file. Although evidence from a PTSD medical expert could shed additional light on how a retroactive diagnosis of PTSD is made and whether Freeman meets the requirements for such a diagnosis, sufficient evidence already exists in the record when coupled with Freeman's testimony at the third hearing regarding his condition in 1973 and earlier.

In 1973 Freeman had an extreme, bad temper; experienced nightly nightmares or flashbacks' had a drinking problem; and "was nuts." (Tr. 50-51, 55.) He testified that he could not focus, which was evidenced by his inability to do the jobs assigned to him at American Motors and his inability to complete any courses at technical school (*see, e.g.*, Tr. 55). Prior to his military service, Freeman was focused enough to be ranked between sixth and eleventh in the nation in cycling and tried out for the Olympics twice; he won Golden Gloves boxing championships three times. (Tr. 544.) After his military service, Freeman's focus was gone. Freeman's aunt reported that he had been

18

athletic, energetic, and a sharp dresser, but "when [he] returned from Vietnam, he had totally become a different person." (Tr. 117.) She reported that her description of his lack of self-care, his stress, and his anxiety applied since his return from Vietnam, though it became worse "yearly." (Tr. 119-20.) Freeman's mother has written that prior to his Army service Freeman

> was a very energetic person always worked and was exprem[e]ly active in sports. Upon his return from the military Larry had lost all interest in life. He couldn't sleep, he was very nervous and anxious. He would not have anything to do with anyone, he kept to himself. This was a complete change from the Son I knew prior to going into the military.

(Tr. 233.) Freeman's ex-wife wrote in November 1995 that after returning from Vietnam Freeman "seemed to have lost all interest in life, he was always very anxious, irritable and he would have sudden outbursts of anger for no apparent reason at all." (Tr. 234.) She said he had difficulty sleeping and would spend hours pacing the house at night. Freeman also lost interest in his personal appearance, though he had been meticulous prior to his military service. Freeman's ex-wife added that the "difference in Larry upon his return from service in Vietnam was absolutely the most unbelievable thing [she] had ever seen in [her] life." (Tr. 234.)

Freeman testified that in 1973 he was withdrawn, avoided family get-togethers, and could pay attention to things only "for a little while and then just pretty soon it just got to the point where I couldn't stand it no more." (Tr. 549.) He missed meals, did not do his laundry, could not cook his own meals, and had flashbacks every night. (Tr. 549-50.)

Freeman's treating physician, Dr. Pritchard, testified during the first administrative hearing that he was familiar with PTSD in Vietnam combat veterans and had treated numerous Vietnam combat veterans for the disorder. (Tr. 68.) He said that the onset of PTSD is usually within three months after the stressful event and sometimes occurred "in country." (Tr. 69.) Dr. Pritchard testified that the letters of Freeman's mother and ex-wife describing Freeman when he returned from the military showed a pattern consistent with PTSD in veterans. (Tr. 69-70.) He said Freeman's

> history and the symptoms are fairly typical of post traumatic stress disorder—usually begins in country; although, often there's, you know, some delay upon a person's return. The symptoms—especially the self-reported symptoms—tend to be of nightmares and flashbacks; the generalized agitation—especially the anger—and it is often accompanied by substance abuse, break-up in relationships, the inability to work—especially the continuing loss of jobs until, finally, unemployment results. The whole pattern is—you know, it's very typical.

(Tr. 72-73.) According to Dr. Pritchard, Freeman had experienced "fairly debilitating symptoms" since his discharge, including social isolation, intrusions on his thoughts making him unable to maintain concentration, poor emotional control, and using alcohol as a relief. (Tr. 73-74.) In Dr. Pritchard's opinion, Freeman experienced daily flashbacks, night and day, that disrupted his concentration and prevented him from learning new material at school or in new jobs, and by 1973 was unemployable. (Tr. 76-77, 80.) Dr. Pritchard added that as of September 4, 1997, Freeman's PTSD was "profoundly severe." (Tr. 41, 71.) Looking back in time, he stated that Freeman's "symptoms have been prominent since—really, I think they began when he was in country and have worsened over the

20

years," though he thought they had improved slightly over the few years preceding the administrative hearing because of treatment.  (Tr. 72.)

Pritchard wrote in his psychological evaluation of Freeman, dated January 17, 1995, as follows:

> Some of Mr. Freeman's symptoms may have well begun during his service in Vietnam as he describes some easy irritability, hypervigilance, nightmares, muscle tension, and other generalized anxieties most of which were reactive to combat situations. . . . His symptoms became increasingly prominent, however, following his discharge in which he immediately encountered what he perceived to be hostility, rejection, and suspicion to which he responded with irritability, violence, and ultimately avoidance and withdrawal.  As he returned home and attempted to settle down to his previous occupation and to his marriage, he began to discover that he was experiencing recurrent and intrusive recollection of his Vietnam experiences, recurrent dreams and nightmares, sleep disturbance, intense flashback experiences, psychomotor agitation and tension, easy irritability, hypervigilance, and disturbance in interpersonal relationship. . . .Over the years his symptoms have become more and more debilitating with reduced concentration and energy, intrusive thoughts, and generalized agitation.

(Tr. 222.)   This psychological evaluation was prepared in accord with Department of Veteran's Affairs guidelines.  (Tr. 222.)   The following diagnosis was provided by Dr. Pritchard under Department of Veteran's Affairs criteria:

> totally incapacitating symptoms with disturbance of thought, perception, and behavior which disrupt almost all daily activities.  He is unable to establish and maintain effective relationships with people, he is unable to sustain his concentration, energy, and effort, mainly because of intrusive thoughts and flashbacks and physiological tension, generalized anxiety, and psychomotor agitation.  He is demonstrably unable to obtain or retain employment.

(Tr. 223.)  In recounting Freeman's background in this VA report, Dr. Pritchard said that

Freeman "has been essentially able to engage in no meaningful employment since the mid

to late 80's."  (Tr. 223.)

In his first decision ALJ Halligan wrote that the "sincere opinions of Dr.

Pritchard persuade[d]" him that Freeman had a severe impairment and passed step two

of the sequential evaluation.  (Tr. 29.)  However, ALJ Halligan mentioned the doctor's

statement about unemployability since the mid-80's as evidence that Freeman did not have

disabling PTSD at the end of 1973.  (Tr. 25.)

In a letter dated November 14, 1997 (after ALJ Halligan issued his decision

but while the matter was on appeal with the Appeals Council), Dr. Pritchard clarified the

time frame of Freeman's condition in a report responding to the decision.  Dr. Pritchard

explained that his prior report had been prepared for the VA and was not intended to be

exhaustive or conclusive about any particular time period:

> It is not necessary in the Veterans Administration for the exact
> onset or the various stages of the disability to be established
> but rather that the disability exists at the present moment.  My
> remark was based on inadequate background information and
> some indifference to his actual condition in the 1970's and
> 80's. . . . I would like to clearly state that it is my opinion based
> on with [sic] Mr. Freeman's clinical presentation and
> information from family members, my experience with a
> number of individuals suffering from Post Traumatic Stress
> Disorder, and the documented history of his work record which
> ends in 1973 that Mr. Freeman was totally disabled and
> incapacitated by his Post Traumatic Stress Disorder by the end
> of 1973.

(Tr. 256.)  Dr. Pritchard also wrote that "[a]lthough I have no doubt I may have answered

under questioning that Mr. Freeman was capable of 'reasonable concentration on normal

repetitive tasks, it is my opinion that he was not capable of sustaining that concentration

and attention or the emotional and behavioral stability necessary for normal employment." (Tr. 256.) In the second appeal of Freeman's claim Judge Stadtmueller concluded that this opinion is the only evidence from a treating physician with an affirmative opinion that Freeman was totally disabled as a result of his PTSD by December 31, 1973. (Tr. 627.)

ALJ Halligan remarked in the second administrative hearing that he saw this as an attempt by Dr. Pritchard to disclaim his testimony at the first hearing and that Dr. Pritchard was drawing "some fine distinctions." (Tr. 512.) ALJ Halligan stated that he was "not impressed by a witness who after the fact tries to put a construction on his testimony that way," but noted that he would take into account that the doctor did not have the benefit of a transcript of his testimony when he wrote the letter. (Tr. 512.) At the second administrative hearing ALJ Halligan also stated that he remembered Dr. Pritchard: "I have a mental image of him. I remember him. I'm bound to tell you it's not a favorable image though. . . . [H]e was a very ideological, a very pompous and a very—in a way he was a somewhat disrespectful witness." (Tr. 510.)

In his second decision ALJ Halligan wrote that he "was not impressed by the overbearing manner of Dr. Pritchard when he testified at the former hearing." (Tr. 350.) Based on Dr. Pritchard's manner and his attempt to re-construe by later letter his prior report and testimony, ALJ Halligan "deeply discount[ed] the two decade plus retroactive opinion by Dr. Pritchard but [did] not disregard him." (Tr. 353.)[4] Judge Stadtmueller found

---

[4]Generally, because of the unique perspective of and longitudinal picture from a treating physician, his opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *accord* SSR 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "Controlling weight" means that the opinion is adopted. SSR 96-2p. A treating physician's opinion may have several points; some may be given controlling weight while others may not. *Id.* An "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

that ALJ Halligan "was within his discretion to discount Dr. Pritchard's opinion as unsupported by the evidence as a whole" and that ALJ Halligan provided reasons for assigning less weight to Dr. Pritchard's testimony. (Tr. 628.) Thus, the discounting of Dr. Pritchard's opinion is the law of the case. But that discounting runs primarily to the November 1997 letter referencing disability in 1973 rather than Dr. Pritchard's testimony about the hallmarks of PTSD and how it can be diagnosed. The latter evidence is not contradicted in the record. Thus, even with a deep discount (or outright disregard) of Dr. Pritchard's November 1997 letter, Dr. Pritchard's testimony and medical reports support a finding of PTSD when examined in combination with Freeman's testimony.[5]

Moreover, ALJ Halligan indicated that he regarded highly another of Freeman's PTSD doctors, Dr. Sheldon Chicks. (Tr. 511 ("I thought a lot of him."), 346 ("Everybody respected Dr. Chicks."), 353 (stating that he "certainly [did] not disregard the comments of the well respected, late Dr. Chicks").) Dr. Chicks had passed away by the date of Freeman's first administrative hearing but he had earlier completed an extensive report on his assessment of Freeman's condition. (Tr. 213-20.) Dr. Chicks wrote: "The

---

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

[5]ALJ O'Grady discounted the reports of Dr. Pritchard and Dr. Chicks based on her incorrect assumption that the doctors had failed to convince the Veterans' Administration to award disability for PTSD any earlier than 1995. That discounting has been rejected and is *not* the law of the case.

onset of Mr. Freeman's present disorder can be placed, given sufficient effort of enquiry, on the third or fourth day of his return to the continental United States after a 15-month tour of duty in Vietnam," as evidenced by Freeman's fighting upon return, stress in traveling to his uncle's house in Texas, and reaction to the train at his mother's house. (Tr. 213.) Dr. Chicks noted that upon Freeman's return to his home in Kenosha "he found himself inexplicably unable to maintain himself in either his marriage, his involvement with his parental family, his previous employment, vocational training, or substitute employment." (Tr. 214.) Dr. Chicks considered Freeman "a reliable and plausible historian." (Tr. 214.) The doctor's report noted in 1994 that the duration of Freeman's PTSD disturbance had been twenty-eight years. (Tr. 219.) Although Dr. Chicks did not provide a definitive statement as to when Freeman became unemployable or whether he was so by the end of 1973, Dr. Chicks's report, of a treating physician whom the ALJ regarded highly, strongly supports a finding that Freeman's PTSD existed no later than three or four days after his return to the continental United States. Moreover, the report strongly supports the finding that upon Freeman's return to his home in Kenosha he was unable to maintain himself in his previous employment or substitute employment. (Tr. 214.)[6]

_____

[6]Judge Stadtmueller thought that Dr. Chicks's report contained evidence suggesting that Freeman was not disabled by the end of 1973 because Dr. Chicks said that in 1994 Freeman had no psychoses or cognitive defects; at his examination was cogent, pleasant, appropriate in mood and thought; and his intelligence was average or higher. (Tr. 630.) However, even after three hearings and proceedings at the administrative level, the record does not contain evidence indicating that any of these features in 1994 affects the PTSD diagnosis. For instance, nothing in the record indicates that PTSD creates psychosis or a decrease in intelligence or would result in Freeman being incoherent or inappropriate. Instead, Dr. Chicks's report also indicates that "[a]s predictable in a non psychotic disorder, none of the cognitive abnormalities found in organic or functional psychoses are exhibited." (Tr. 214.) After sixteen years and three administrative proceedings and appeals to district court, this court will not remand this case based on these comments in Dr. Chicks's report.

Judge Stadtmueller has rejected ALJ Halligan's conclusion that "Dr. Chicks intended to record a cumulative condition worsening over many years resulting by 1997, but not long before then" (Tr. 353) as unsupported (Tr. 629-30).

That Freeman worked for a few years at American Motors does not diminish this Dr. Chicks's opinion regarding Freeman's inability to *maintain* employment. As noted by the Seventh Circuit, a disabled person may exhibit superhuman effort to attempt to hold down a job or be employed because of the altruism of the employer. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 983 (7th Cir. 1999); *Wilder*, 153 F.3d at 801. Freeman's testimony at the third hearing indicates that even though he was employed at American Motors, he was shifted from position to position without success. He then stopped working and attempted schooling but could not complete or succeed at that, either. This pattern of unsuccessful work, combined with Dr. Chicks's finding of onset of PTSD and comment about Freeman's inability to maintain employment, confirm the existence of disabling PTSD soon after his return to the United States (rather than merely twenty years later when first diagnosed in 1994 or 1995).

In addition, ALJ Halligan did not provide any basis for not giving the opinion of Dr. Ivan Aubuchon proper treating-physician weight. (*See* Tr. 353 ("[T]he Administrative Law Judge deeply discounts the two decade plus retroactive opinion by Dr. Pritchard but does not disregard him or Dr. Aubuchon and certainly does not disregard the comments of the well respected, late Dr. Chicks.").) Dr. Aubuchon interacted with Freeman in a Vietnam veterans therapy group beginning in April 1997. The doctor reviewed Freeman's reports of psychiatric and psychological evaluations and stated that the history and symptoms in those reports were consistent with information Freeman gave him and his own observations. (Tr. 258.) Dr. Aubuchon reported in progress notes on February 25, 1998, as follows:

After discharge from the military Mr. Freeman never made an adjustment to civilian life.  The description given by Mr. Freeman of his experiences after discharge indicate the onset of PTSD shortly after discharge from military.   The symptoms of PTSD displayed by Mr. Freeman in group therapy prevent Mr. Freeman from gainful employment at this time.  These same symptoms are reported by Mr. Freeman to have existed since military service discharge.

Mr. Freeman would not have been able to understand and carry out simple instructions from day to day, have the concentration to do simple repetitive types of work or perform work that may require interpersonal relationship skill.  The symptoms of Post Traumatic Stress Disorder related to Vietnam combat trauma that existed after military service discharge would have prevented any type of consistent employment.

(Tr. 258.)  As stated above, this comment is part of Dr. Aubuchon's progress notes—not part of a letter addressed to an agency seeking to obtain benefits for the patient.

Thus, although Dr. Aubuchon did not state (as Dr. Pritchard did) that Freeman was unemployable as of the express date of December 31, 1973, his progress notes indicate the same thing:  immediately after discharge from military service Freeman's PTSD impeded his concentration and ability to work and prevented him from maintaining employment.   Taken together, treating physician Dr. Chicks's diagnosis of Freeman's PTSD existing within days of his arrival in the United States, treating-physician Dr. Aubuchon's above-stated notes indicating that Freeman's PTSD was debilitating shortly after his discharge, and treating-physician Dr. Pritchard's testimony and reports (even if the latter is deeply discounted) indicate that Freeman was completely unemployable within a few days or weeks of his return from military service in Vietnam, and certainly by December 31, 1973.

The record establishes the fallacy of the Appeals Council's and ALJ's presumption that lack of medical care for PTSD prior to 1994 suggests that PTSD did not exist for Freeman to a disabling extent before that date. Freeman first heard about PTSD when he went to the VA for an x-ray on his back and the doctor referred him to a PTSD doctor. (Tr. 62.) In a letter dated September 15, 1995, clarifying a previous disability report, Dr. Pritchard wrote:

> It is not unusual for veterans of the Vietnam War who suffered from PTSD to seek medical, psychiatric, and/or Veteran's Administration assistance long after the onset of their symptoms, as many, if not most, choose to rely on avoidance, inhibition, suppression, substance abuse, and other means of denial in order to cope with their symptoms.

(Tr. 221.) In responding to ALJ Halligan's first decision, suggesting that Freeman's failure to seek treatment diminished his credibility, Dr. Pritchard stated: "Historically the identification of Post Traumatic Stress Disorder and the subsequent provision of treatment was extremely slow in coming to these veterans. Indeed in 1973, the diagnosis of PTSD was not in common use, there was no provision for routine examination of these symptoms in Vietnam era veterans, and there was little or no available treatment for them." (Tr. 257.) According to a discussion of PTSD Veteran's Administration's physician's guide, PTSD diagnosis of Vietnam veterans "was prevented . . . by the fact that DSM II, in effect from 1968 to 1980, provided no diagnostic category for a war stress reaction. This was corrected in 1980 by DSM III, which established the diagnosis of PTSD . . . and set forth clear diagnostic criteria." (Tr. 232, 294.) The record provides no contrary evidence showing that PTSD in Vietnam veterans was recognized and regularly treated in the 1970s.

28

Dr. Pritchard confirmed that PTSD doctors do not need medical documentation to establish a PTSD diagnosis. (Tr. 71.) He could retroactively assess a mental illness based on a self-reported history of symptoms, statements from family, history of employment, and existence of a traumatic event that could have caused the PTSD symptoms. (Tr. 70-71.) Dr. Chicks diagnosed Freeman retroactively, as did Dr. Aubuchon, based upon Freeman's recount of his history.

Of course, these retroactive diagnoses were impacted by Freeman's credibility, which ALJ Halligan found to be "not the best but not the wors[t]." (Tr. 353.) ALJ Halligan found that "the demeanor, voice, countenance, and memory of the claimant were not very persuasive" (Tr. 352) and that "factors like memory, passage of time, and unconscious forensic influences on testimony cut against the claimant here" (Tr. 353.) Judge Stadtmueller upheld this credibility determination as sufficiently supported and it is the law of the case. Nevertheless, even with some discounting of Freeman's credibility the overwhelming evidence establishes Freeman's disability by 1973. His credibility may not be the best or the worst but it is enough. ALJ O'Grady, for instance, did not make any finding that Freeman's credibility was questionable. She adopted ALJ Halligan's discussion of prior evidence, but as to the testimony at the third hearing she said merely that Freeman was vague as to why he was unable to work and that he had used marijuana and alcohol after his Vietnam service. ALJ O'Grady did not say she was discounting his testimony from the third hearing regarding his mental condition in the years soon after his Vietnam service. (*See* Tr. 621-22.) Dr. Chicks found Freeman to be a plausible historian. And Freeman's description of his PTSD flashbacks or dreams is fairly consistent throughout the record—for instance, his recollection of the young medic who one minute was drinking

cocoa and a few minutes later was dead runs throughout the record. Moreover, the descriptions of Freeman's behavior from his aunt's, mother's, and ex-wife's reports coincide. Finally, as noted by Judge Stadtmueller, Freeman's alcohol and drug use and criminal behavior, which ALJ Halligan used to discount his testimony, are evidence of significant PTSD. (Tr. 635.)

Importantly, it is undisputed that Freeman was unemployable by 1995 (when the VA found him so), and the record shows no profound changes in his condition between 1973 and 1995. Instead, the profound changes occurred in the first few years following his return from Vietnam. Those changes show a condition consistent with disabling PTSD even before 1973.

The only evidence to the contrary of an award of benefits is worth little to no weight. On January 19, 1996, Dr. Roger Rattan opined that Freeman had no medically determinable impairment. (Tr. 128.) Rattan appears to be an agency doctor who never treated Freeman and merely reviewed the file existing at that time. He provided zero analysis of why he made that finding. He merely checked a box for his medical disposition. (Tr. 128-36.) Another agency doctor, Robert Hodes, opined on July 18, 1995, that what he reviewed was insufficient medical evidence upon which to base any finding of an affective disorder or anxiety related disorder. (Tr. 138, 141-42.) Much evidence has been added to the file since these reports, which predated the first administrative hearing. Moreover, the opinions of non-treating, non-examining doctors who provide no analysis are generally given very little weight anyway. *See* 20 C.F.R. § 404.1527(d)(1), (3).

Evidence that Freeman's condition seemed to be worsening over time, especially around 1995 when he filed his claim for benefits, similarly means little. (*See* Tr.

30

634 ("The court notes that while this evidence supports a conclusion that Freeman's condition has worsened over the years, that conclusion is not necessarily inconsistent with a conclusion that Freeman was disabled as of December 31, 1973.").)  That PTSD condition has worsened indicates little about whether it was disabling to begin with.

The record now overwhelmingly shows that Freeman experienced the trauma triggering his PTSD in Vietnam in 1965 and 1966; the onset of PTSD occurred in Vietnam or during the days or weeks immediately following his return to the United States according to treating physicians; the descriptions by Freeman and his family members of his behavior, emotions, and experiences subsequent to his return, including in the years between 1966 and 1973, are consistent with the symptoms of severe PTSD; his interpersonal and work history and alcohol use during the years 1966 and 1973 are consistent with the symptoms of severe PTSD; and the substantial changes in his behavior, emotions, flashbacks, and nightmares occurred within the year immediately following 1966 rather than during some delayed period between 1973 and 1995. Freeman's testimony concerning his condition when he returned from military service matches his doctors' descriptions of severe and disabling PTSD.  Drs. Aubuchon and Chicks stated that after Freeman's return from Vietnam he would not have had the ability to maintain concentration or employment.  VE Schroeder testified at the second administrative hearing that if the hypothetical person described by ALJ Halligan had deficiencies of concentration, persistence or pace resulting in frequent failure to complete a task in a timely manner, that condition would eliminate all of the jobs the VE indicated would exist.  (Tr. 569.)

For the reasons stated above, all essential factual issues have been resolved and the record compellingly supports a finding that as of December 31, 1973, Freeman could not maintain employment in his past assembly work or any other type of work in the economy.

CONCLUSION

Therefore,

IT IS ORDERED that the Commissioner's decision is reversed and this case is remanded (under sentence four of 42 U.S.C. § 405(g)) with instructions that Freeman's application for DIB be granted.

Dated at Milwaukee, Wisconsin, this 16th day of September, 2011.

BY THE COURT


/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE